******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

EVELEIGH, J., dissenting. I respectfully disagree with the majority conclusion that the arrest policy of the Newtown Police Department (department) "applies solely to the criminal context and therefore does not apply when the police take a person into custody pursuant to [General Statutes] § 17a-503 (a)." See Newtown Board of Police Commissioners, Newtown Police Policy and Procedure 3.00 (revised February 1, 2005) (Policy Manual). Instead, I would conclude that the plain meaning of the word "[a]rrest," which is defined in the policy as "[t]aking a person into custody," creates a ministerial duty requiring the police to search anyone who has been taken into custody for whatever reason. Id., pt. III A, p. 1. Therefore, I respectfully dissent.

I begin by noting my agreement with the facts and law set forth in the majority opinion. There is, therefore, no need to repeat either at length in this dissent. My differences with the majority opinion lie in the interpretation of the Policy Manual. I will add facts and law only when necessary to advance the discussion set forth in this dissent.

It should be noted that, after his interaction with Stanley Lupienski, Officer Steven Borges proceeded to fill out a "police emergency examination request" form to be provided to both the ambulance driver and the hospital. The form, which is issued by the Connecticut Department of Mental Health and Addiction Services, contains the following language: "Any police officer who has reasonable cause to believe that a person has psychiatric disabilities and is dangerous to himself or herself or others or gravely disabled, and in need of immediate care and treatment, may take such person into custody and take or cause such person to be taken to a general hospital for emergency examination under this section. The officer shall execute a written request for emergency examination detailing the circumstances under which the person was taken into custody and such request shall be left with the facility. The person shall be examined within twenty-four hours and shall not be held for more than seventy-two hours unless committed under section 17a-502." This language comes, almost verbatim, from § 17a-503 (a). Borges signed the form in a box beneath a sentence stating: "It is my belief that the above named person is mentally ill and dangerous to himself, herself or others or gravely disabled and is need of immediate care and treatment." At no point did any member of the department make any effort to search or frisk Lupienski.

The department's manual contains a policy governing the subject of arrests. Policy Manual, supra, 3.00. This policy begins with a section entitled "definitions," and the first term listed therein is "[a]rrest," which is defined

as "[t]aking a person into custody." Id., pt. III, p. 1. A later section of the policy, entitled "[s]earch [i]ncident to [a]rrest" provides that "[o]fficers shall conduct a thorough search of the person arrested." Id., pt. IV H, p. 4. The defendant, the town of Newtown, admitted in the underlying pleadings that the policy governing arrests would have applied any time one of its police officers "took a person into custody" and that "it was mandatory for officers to conduct a thorough search of any person taken into custody." The defendant further admitted that "[u]nder the policy governing arrests, officers did not have discretion to decline to search a person taken into custody," and that "[u]nder the policy . . . the duty of an officer to search a person who had been taken into custody was not left to the judgment or discretion of the officer." The defendant admitted these statements and then added that the policy applied when someone was arrested. In my view, it is clear that the policy applied when someone is arrested. It is also clear that the policy defines an arrest to be whenever someone is taken into custody. The policy does not define arrest to mean someone is taken into custody "for a criminal offense." The majority has now added words to the definition which do not appear in the policy. In my view, respectfully, since both the policy and definition are plain and unambiguous we should not be placing our own judicial gloss on that definition.

The policy explicitly requires that, in the case of an arrest, "[o]fficers shall conduct a thorough search of the person arrested." Policy Manual, supra, 3.00, pt. IV H 1, p. 4. As this court has previously explained, "the word shall creates a mandatory duty when it is juxtaposed with [a] substantive action verb." (Internal quotation marks omitted.) *Wiseman* v. *Armstrong*, 295 Conn. 94, 101, 989 A.2d 1027 (2010). In light of the policy's use of the word "shall," together with the absence of any "qualifying words" like "should"; see *Ugrin* v. *Cheshire*, 307 Conn. 364, 391–92, 54 A.3d 532 (2012); conducting a search incident to an arrest is a ministerial act "required by [a] city charter provision, ordinance, regulation, rule, policy, or any other directive . . . ." *Violano* v. *Fernandez*, 280 Conn. 310, 323, 907 A.2d 1188 (2006). The only question in the present case, therefore, is whether the policy applies only to criminal arrests, which the policy does not say, or to anyone who is taken into custody, which is precisely the manner in which the policy itself defines arrests.

If the language of a municipal regulation is plain and unambiguous, "we need look no further than the words themselves . . . ." *State* v. *Spears*, 234 Conn. 78, 86, 662 A.2d 80, cert. denied, 516 U.S. 1009, 116 S. Ct. 565, 133 L. Ed. 2d 490 (1995).[1] The court cannot "engraft amendments" onto the policy to alter its plain meaning; (internal quotation marks omitted) *Costantino* v. *Skolnick*, 294 Conn. 719, 736, 988 A.2d 257 (2010); and must proceed by "referring to what the . . . text contains,

not by what it might have contained." (Internal quotation marks omitted.) *Local 218 Steamfitters Welfare Fund* v. *Cobra Pipe Supply & Coil Co.*, 207 Conn. 639, 645, 541 A.2d 869 (1988); cf. *Doe* v. *Norwich Roman Catholic Diocesan Corp.*, 279 Conn. 207, 216, 901 A.2d 673 (2006) ("It is axiomatic that the court itself cannot rewrite a statute to accomplish a particular result. That is the function of the legislature." [Internal quotation marks omitted.]).

These principles teach that "custody" means custody—not custody for a criminal offense. The majority opinion would engraft this additional language onto the policy's definition of arrest. "When legislation defines the terms used therein such definition is exclusive of all others." (Internal quotation marks omitted.) *Feldman* v. *Sebastian*, 261 Conn. 721, 728, 805 A.2d 713 (2002). This principle is equally applicable to municipal regulations. See footnote 1 of this opinion; cf. *Neptune Park Assn.* v. *Steinberg*, 138 Conn. 357, 362, 84 A.2d 687 (1951) ("The zoning ordinance involved in this case, however, defines the word 'family' as it is used therein. When any piece of legislation defines the terms as they used in it, such definition is exclusive of all others.").

This court has explained that § 17a-503 (a) contemplates "transportation of a person involuntarily for a psychiatric examination"; *Hopkins* v. *O'Connor*, 282 Conn. 821, 840, 925 A.2d 1030 (2007); and a police officer's "mandatory report pursuant to § 17a-503" is such an "essential step in . . . involuntary commitment" that the act of filling out the form is protected by absolute immunity. Id. "Involuntary civil confinement is a massive curtailment of liberty"; (internal quotation marks omitted) *Rzayeva* v. *Foster*, 134 F. Supp. 2d 239, 248 (D. Conn. 2001); and, accordingly, compulsory hospitalization may only be accomplished upon a showing of probable cause—the same standard used in criminal arrests. *Glass* v. *Mayas*, 984 F.2d 55, 58 (2d Cir. 1993). Moreover, in addition to the seventy-two hour confinement authorized by § 17a-503 (a) itself, this court has recognized that "a police officer's actions under § 17a-503 result in a person being detained in a psychiatric hospital for evaluation to determine whether further detention and ultimately commitment are proper" and are, thus, "the first step in the distinct possibility of a judicial proceeding" for more permanent, involuntary commitment. (Internal quotation marks omitted.) *Hopkins* v. *O'Connor*, supra, 837.

The term "arrest" has been used to describe civil mental health related seizures. For example, the United States Court of Appeals for the Second Circuit described New York's civil commitment statute; N.Y. Mental Hyg. Law § 9.41 (McKinney 2011); as authorizing "the arrest of a person who appears to be mentally ill and acts in a manner likely to result in serious harm to himself or others." *Payne* v. *Jones*, 711 F.3d 85, 88

(2d Cir. 2013); see id. (noting that plaintiff was placed under arrest pursuant to civil commitment statute). Similarly, in *Disability Advocates, Inc.* v. *McMahon*, 124 F. Appx. 674, 677 (2d Cir. 2005), the Second Circuit quoted Black's Law Dictionary (7th Ed. 1999), for the proposition that " 'arrest' [is] defined as a 'seizure or forcible restraint' " in support of its determination that New York's civil commitment statute granted police the "legal authority to arrest."

The opinion of the United States District Court for the Northern District of New York that was affirmed by the Second Circuit in *Disability Advocates, Inc.*, supra, 124 F. Appx. 674, gives a thorough explanation of why police seizure for purposes of involuntary hospitalization may reasonably be considered an arrest: "[W]hile [the civil commitment statute] may not use the term 'arrest,' the authority it grants to the police is, in fact, the legal authority to arrest. As used in the law, the word 'arrest' is defined as 'to seize [a person] by legal authority or warrant; take into custody.' The Random House [Dictionary of the English Language (1979)] . . . .[2] This is exactly what [the civil commitment statute] does—it authorizes the police to take a person into custody by legal authority. The term 'arrest' is not limited to use in criminal law. . . .[3] There are numerous instances where New York law gives police the authority to take a person into custody outside of the criminal context. . . .[4] Although there are some negative connotations in the use of the word 'arrest,' it is not improper for [the government] to use a word, or a document that uses a word, that accurately describes their actions when they take an individual into custody pursuant to [the civil commitment statute]." (Citations omitted; footnotes added and omitted.) *Disability Advocates, Inc.* v. *McMahon*, 279 F. Supp. 2d 158, 164–65 (N.D.N.Y. 2005).

Likewise, Connecticut has numerous statutes which provide for arrests in a civil context. See, e.g., General Statutes § 52-143 (e) (if witness fails to respond to subpoena to testify in court, the court "may issue a capias directed to some proper officer to arrest the witness and bring him before the court to testify," though no criminal offense has been committed); see also General Statutes § 17b-745 (a) (8) (authorizes judges and family magistrates to enforce family support orders through noncriminal contempt, and if defendant fails to appear for contempt hearing judge or magistrate may order official "to arrest such defendant and bring such defendant before the Superior Court for a contempt hearing"); General Statutes § 53a-32 (a) ("[a]ny probation officer may arrest any defendant on probation without a warrant or may deputize any other officer with power to arrest to do so by giving such other officer a written statement setting forth that the defendant has, in the judgment of the probation officer, violated the conditions of the defendant's probation"). Similar authority

exists for the arrest of parolees who have committed technical, i.e., noncriminal-parole violations. See General Statutes § 54-127 (police officers "shall arrest and hold any parolee or inmate when so requested, without any written warrant"); see also General Statutes § 17a-503 (a) (authorizes police officer to take person into custody when officer has reasonable cause to believe "has psychiatric disabilities and is dangerous to himself or herself or others or gravely disabled, and in need of immediate care and treatment"); General Statutes § 17a-503 (b) (court of probate may, on application, "issue a warrant for the apprehension" of person alleged to suffer from psychiatric disability); General Statutes § 52-489 (courts may, through writ of ne exeat, order person taken into custody to compel bond ensuring continued presence within state). Therefore, in my view, it is clear that the meaning of the term "arrest" in the law quite commonly extends to civil as well as criminal confinement.

Application of the policy requiring police to conduct mandatory searches to civil arrests, such as those under § 17a-503 (a), is required by that policy's plain text. Persons taken into custody under § 17a-503 are subject to search incident to that arrest. As the United States Supreme Court has held, in upholding a search incident to a civil immigration arrest: "There can be no doubt that a search for weapons has as much justification here as it has in the case of an arrest for crime, where it has been recognized as proper. . . . It is no less important for government officers, acting under established procedure to effect a deportation arrest rather than one for crime, to protect themselves and to insure that their prisoner retains no means by which to accomplish an escape." *Abel* v. *United States*, 362 U.S. 217, 236, 80 S. Ct. 683, 4 L. Ed. 2d 668 (1960). As another court has explained: "When an officer takes a suspect into custody, it does not matter if it is for a criminal offense or on a civil warrant. The key is custody, not the underlying reason for it." *People* v. *Miller*, 354 Ill. App. 3d 476, 480, 820 N.E.2d 1216 (2004), cert. denied, 214 Ill. 2d 544, 830 N.E.2d 7 (2005). Thus, the definition of "arrest" set forth in the definitions section of the policy, which refers explicitly to people who have been taken into custody, makes even more sense when considered in this context. Policy Manual, supra, 3.00, pt. III, p. 1.

The majority cites to the policy's definition of "probable cause for arrest" in support of its conclusion. See id. That phrase is defined as, "[t]he existence of facts and circumstances that would lead a reasonably prudent officer to believe that a person had committed a criminal offense." Id. This phrase is the one point in which the policy uses the term "criminal offense." The phrase is neither located in the definition of "arrest," nor the identification of the lawful bases for an arrest. In my view, it is clear that the department knew how

to insert the phrase "a criminal offense" when it wanted to. The fact that the department chose not to insert the phrase when defining the term "arrest," and further chose not to use the term to further clarify the phrase "taken into custody," evinces a clear intent that the term should apply to any custodial situation. The majority further recites the procedural requirements which it maintains make it clear that the arrest policy only applies in the criminal context. For example, it recites language in the policy requiring that "arresting officers shall identify themselves, inform the suspect of his or her arrest, and specify the charges for which the arrest is being made." Policy Manual, supra, 3.00, pt. IV D 3, p. 3. Again, these procedures apply equally to any civil arrest. The officer need only recite the statute pursuant to which he is exercising authority over the person detained and seized. The term arrest is equated with seizure. The fact that Lupienski was taken into custody is not disputed. Pursuant to the Policy Manual, the officer was required to perform a search of Lupienski at that time. The fact that a search was not performed exposes the defendant, in my view, to potential liability. Therefore, I would reverse the judgment of the trial court and remand the case with instructions to deny the defendant's motion for summary judgment and for further proceedings according to law.

Therefore, I respectfully dissent.

[1] I note that, "[i]n construing [municipal] regulations, the general rules of statutory construction apply." *Smith* v. *Zoning Board of Appeals*, 227 Conn 71, 89, 629 A.2d 1089 (1993), cert. denied, 510 U.S. 1164, 114 S. Ct. 1190, 127 L. Ed. 2d 540 (1994); see also *Schwartz* v. *Planning & Zoning Commission*, 208 Conn. 146, 153, 543 A.2d 1339 (1988).

[2] See Black's Law Dictionary (7th Ed. 1999) ("[a] seizure or forcible restraint"); Black's Law Dictionary (6th Ed. 1990) ("[to] deprive a person of his liberty by legal authority"); see also *People* v. *Gilmore*, 76 App. Div. 2d 548, 552–53, 430 N.Y.S.2d 854 (1980) (" '[a]rrest' has been defined as 'the taking, seizing, or detaining of the person of another, (1) by touching or putting hands on him; (2) or by any act that indicates an intention to take him into custody and that subjects him to the actual control and will of the person making the arrest; or (3) by the consent of the person to be arrested' "), quoting 5 Am. Jur. 2d 695, Arrest § 1 (1962).

[3] See, e.g., Black's Law Dictionary (7th Ed. 1999) (containing entries for "arrest in execution," "arrest in quarters," "arrest on final process," "arrest on mesne process," and "civil arrest"); Black's Law Dictionary (6th Ed. 1990) (containing entries for "arrest of inquest," and "arrest of judgment").

[4] See, e.g., N.Y. Fam. Ct. Act §§ 718, 724, 1024 (McKinney 2010); N.Y. Mental Hyg. Law §§ 9.27, 9.37, 9.41 (McKinney 2011); N.Y. Soc. Servs. Law § 417 (McKinney 2010).